Nos. 20-16176, 20-16256
_____

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
_____

ZACHARY SILBERSHER, RELATOR, *Plaintiff-Appellant,*
and
UNITED STATES OF AMERICA ET AL., EX REL., *Plaintiffs,*
v.
VALEANT PHARMACEUTICALS INTERNATIONAL, INC.; VALEANT PHARMACEUTICALS INTERNATIONAL; SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; DR. FALK PHARMA GMBH, *Defendants-Appellees.*

_____

ZACHARY SILBERSHER, RELATOR, *Plaintiff-Appellee,*
and
UNITED STATES OF AMERICA ET AL., EX REL., *Plaintiffs,*
v.
VALEANT PHARMACEUTICALS INTERNATIONAL, INC., VALEANT PHARMACEUTICALS INTERNATIONAL, SALIX PHARMACEUTICALS, LTD., SALIX PHARMACEUTICALS, INC., *Defendants,*
and
DR. FALK PHARMA GMBH, *Defendant-Appellant.*

_____

Appeals from the United States District Court for the Northern District of California Civil Case No. 3:18-cv-01496-JD (Honorable James Donato)

_____

**APPELLANT'S THIRD BRIEF**
_____

Nicomedes Sy Herrera
Bret D. Hembd
HERRERA KENNEDY LLP
1300 Clay Street, Suite 600
Oakland, CA 94612
510.422.4700

Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
202.362.0636

*Additional Counsel Listed on Inside Cover*

Warren T. Burns
Christopher J. Cormier
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
469.904.4550

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................ii

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE CASE ................................................................ 1

SUMMARY OF ARGUMENT ............................................................... 3

ARGUMENT ........................................................................................ 7

   I.   This Court Has Appellate Jurisdiction ......................................... 7

   II.   The Public Disclosure Bar Does Not Compel Dismissal ............. 12

      A. Defendants' Arguments About the History and Purpose of
         the Public Disclosure Bar Amendments Lack Merit ................ 12

      B. The *GeneriCo* IPR Is Not a Qualifying Public Disclosure ........ 17

      C. The Law360 Article Summarizing the *GeneriCo* IPR Is
         Not a Qualifying Public Disclosure ......................................... 34

      D. The Patent Prosecution Dockets Are Not Qualifying
         Public Disclosures ................................................................... 35

      E. The Brunner and Marakhouski Studies Are Not
         Qualifying Public Disclosures.................................................. 41

      F. Silbersher Is an Original Source ............................................. 43

   III.   The Complaint Pleads Violations of the False Claims Act ............ 45

      A. The Complaint Pleads Falsity .................................................. 46

      B. The Complaint Pleads Materiality ...........................................54

      C. The Complaint Satisfies Federal Rule of Civil
         Procedure 9(b) ......................................................................... 60

   IV.   Dr. Falk Is Not Entitled to Dismissal ........................................ 62

      A. The District Court Had Personal Jurisdiction Over
         Dr. Falk.................................................................................... 62

      B. Dr. Falk Is Not Entitled to Dismissal on the Merits................ 68

CONCLUSION .................................................................................... 70

# TABLE OF AUTHORITIES

## Cases

*Allergan, Inc. v. Athena Cosmetics, Inc.,*
  738 F.3d 1350 (Fed. Cir. 2013) ....................................................... 10, 11

*Amity Rubberized Pen Co. v. Mkt. Quest Grp. Inc.,*
  793 F.3d 991 (9th Cir. 2015) ................................................................ 12

*Amphastar Pharms. Inc. v. Aventis Pharma SA,*
  2013 WL 12139832 (C.D. Cal. Apr. 19, 2013), *vacated on other
  grounds,* 2015 WL 4511573 (C.D. Cal. July 20, 2015), *vacatur
  aff'd,* 856 F.3d 696 (9th Cir. 2017) ....................................................... 46

*Amphastar Pharms. Inc. v. Aventis Pharma SA,*
  856 F.3d 696 (9th Cir. 2017) ...................................................... 9, 26, 46

*Avid Identification Sys., Inc. v. Crystal Import Corp.,*
  603 F.3d 967 (Fed. Cir. 2010) .............................................................. 69

*Avocent Huntsville Corp. v. Aten Int'l Co.,*
  552 F.3d 1324 (Fed. Cir. 2008) ............................................................ 66

*In re Baycol Prods. Litig.,*
  732 F.3d 869 (8th Cir. 2013) ............................................................... 61

*Beco Dairy Automation, Inc. v. Glob. Tech Sys., Inc.,*
  104 F. Supp. 3d 1023 (E.D. Cal. 2015) ................................................ 68

*Bellevue v. Universal Health Servs. of Hartgrove, Inc.,*
  867 F.3d 712 (7th Cir. 2017) ............................................................... 25

*Cause of Action v. Chi. Transit Auth.,*
  815 F.3d 267 (7th Cir. 2016) .......................................................... 19, 24

*Christianson v. Colt Indus. Operating Corp.,*
  486 U.S. 800 (1988) ............................................................................... 7

*Cook County v. United States ex rel. Chandler*,
   538 U.S. 119 (2003) ................................................................. 46

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) ................................................. 15

*Ebates Performance Mktg., Inc. v. MyMail, Ltd.*,
   2021 WL 121130 (N.D. Cal. Jan. 13, 2021) ......................... 66

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
   --- S. Ct. ----, 2021 WL 1132515 (Mar. 25, 2021) .................... 63, 64, 67

*Goodman v. Lee*,
   988 F.2d 619 (5th Cir. 1993) ................................................. 19

*Gunn v. Minton*,
   568 U.S. 251 (2013) ................................................................. 11

*Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001) .................................................. 53

*Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
   276 F.3d 1032 (8th Cir. 2002) .............................................. 53

*Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*,
   833 F.3d 1125 (9th Cir. 2016) .............................................. 15

*Prather v. AT&T, Inc.*,
   847 F.3d 1097 (9th Cir. 2017) .............................................. 44

*Return Mail, Inc. v. U.S. Postal Serv.*,
   139 S. Ct. 1853 (2019) ........................................................... 28

*Ruckh v. Salus Rehab., LLC*,
   963 F.3d 1089 (11th Cir. 2020) ............................................ 56

*SAS Inst. Inc. v. Iancu*,
   138 S. Ct. 1348 (2018) ....................................................... 28, 30

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
   563 U.S. 401 (2011) .................................................................38, 39, 40

*Silbersher v. Allergan Inc.*,
   2020 WL 7319407 (N.D. Cal. Dec. 11, 2020), *motion to certify*
   *appeal granted*, 2021 WL 292244 (N.D. Cal. Jan. 28, 2021) ....... *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................24

*Therasense, Inc. v. Becton, Dickinson & Co.*,
   649 F.3d 1276 (Fed. Cir. 2011) ..............................................................8

*U.S. CFTC v. Monex Credit Co.*,
   931 F.3d 966 (9th Cir. 2019) ................................................................44

*United States ex rel. Alcohol Found., Inc. v. Kalmanovitz*
   *Charitable Found., Inc.*,
   186 F. Supp. 2d 458 (S.D.N.Y.),
   *aff'd*, 53 F. App'x 153 (2d Cir. 2002) ..................................................42

*United States ex rel. Banigan v. PharMerica, Inc.*,
   950 F.3d 134 (1st Cir. 2020) .................................................................14

*United States ex rel. Bibby v. Mortg. Invs. Corp.*,
   987 F.3d 1340 (11th Cir. 2021) ............................................................59

*United States ex rel. Bierman v. Orthofix Int'l, N.V.*,
   177 F. Supp. 3d 712 (D. Mass. 2016) ..................................................57

*United States ex rel. Campbell v. KIC Dev., LLC*,
   2019 WL 6884485 (W.D. Tex. Dec. 10, 2019) ....................................56

*United States ex rel. Campie v. Gilead Scis., Inc.*,
   862 F.3d 890 (9th Cir. 2017) ...............................................46, 47, 48, 58

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
   865 F.3d 71 (2d Cir. 2017) ....................................................................61

iv

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
    842 F.3d 103 (1st Cir. 2016) ................................................................ 59

*United States ex rel. Garbe v. Kmart Corp.*,
    824 F.3d 632 (7th Cir. 2016) ......................................................... 51, 56

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ................................................................ 61

*United States ex rel. Harrison v. Westinghouse Savannah River
    Co.*,
    352 F.3d 908 (4th Cir. 2003) ................................................................ 55

*United States ex rel. Heath v. AT&T, Inc.*,
    791 F.3d 112 (D.C. Cir. 2015) ............................................................ 61

*United States ex rel. Hendow v. Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006) ............................................... 14, 46, 47

*United States ex rel. Holloway v. Heartland Hospice, Inc.*,
    960 F.3d 836 (6th Cir. 2020) ................................................................ 13

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
    874 F.3d 905 (6th Cir. 2017) ......................................................... 13, 21

*United States ex rel. Integra Med Analytics LLC v. Providence
    Health & Servs.*,
    2019 WL 3282619 (C.D. Cal. July 16, 2019), *rev'd on other
    grounds*, No. 19-56367, ECF 67-1 (9th Cir. Mar. 31, 2021) ............... 41

*United States ex rel. Lusby v. Rolls-Royce Corp.*,
    570 F.3d 849 (7th Cir. 2009) ................................................................ 61

*United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*,
    591 F. App'x 693 (11th Cir. 2014) ...................................................... 62

*United States ex rel. Mei Ling v. City of Los Angeles*,
    389 F. Supp. 3d 744 (C.D. Cal. 2019) ................................................. 59

*United States ex rel. Moore & Co. v.*
  *Majestic Blue Fisheries, LLC,*
  812 F.3d 294 (3d Cir. 2016) ............................................................... 13

*United States ex rel. Oliver v. Parsons Co.,*
  195 F.3d 457 (9th Cir. 1999) .......................................................... 53

*United States ex rel. Oliver v. Philip Morris USA Inc.,*
  826 F.3d 466 (D.C. Cir. 2016) ....................................................... 25

*United States ex rel. Polukoff v. St. Mark's Hosp.,*
  895 F.3d 730 (10th Cir. 2018) ........................................................ 69

*United States ex rel. Prather v.*
  *Brookdale Senior Living Cmtys., Inc.,*
  892 F.3d 822 (6th Cir. 2018) .......................................................... 58

*United States ex rel. Reed v. KeyPoint Gov't Sols.,*
  923 F.3d 729 (10th Cir. 2019) ........................................................ 24

*United States ex rel. Rose v. Stephens Inst.,*
  909 F.3d 1012 (9th Cir. 2018) ................................................... 52, 57

*United States ex rel. Shemesh v. CA, Inc.,*
  89 F. Supp. 3d 36 (D.D.C. 2015) ................................................... 57

*United States ex rel. Solis v. Millennium Pharms., Inc.,*
  885 F.3d 623 (9th Cir. 2018) .......................................................... 24

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn,*
  14 F.3d 645 (D.C. Cir. 1994) .......................................................... 20

*United States ex rel. Stepe v. RS Compounding LLC,*
  325 F.R.D. 699 (M.D. Fla. 2017) ................................................... 56

*United States ex rel. Strauser v.*
  *Stephen L. LaFrance Holdings, Inc.,*
  2019 WL 1086363 (N.D. Okla. Mar. 7, 2019) ............................... 56

*United States ex rel. Ubl v. IIF Data Sols.*,
　2007 WL 2220586 (E.D. Va. Aug. 1, 2007)..........................................57

*United States ex rel. Yannacopolous v. Gen. Dynamics*,
　315 F. Supp. 2d 939 (N.D. Ill. 2004)....................................................14

*United States v. Bourseau*,
　531 F.3d 1159 (9th Cir. 2008) ..........................................................8, 14

*United States v. DynCorp Int'l, LLC*,
　253 F. Supp. 3d 89 (D.D.C. 2017) .......................................................51

*United States v. Ehrlich*,
　643 F.2d 634 (9th Cir. 1981) ...............................................................51

*United States v. Fausto*,
　484 U.S. 439 (1988) .............................................................................40

*United States v. Gen. Dynamics Corp.*,
　19 F.3d 770 (2d Cir. 1994) ..................................................................51

*United States v. Guillen-Cervantes*,
　748 F.3d 870 (9th Cir. 2014) ...............................................................15

*United States v. United Healthcare Ins. Co.*,
　848 F.3d 1161 (9th Cir. 2016) ......................................................60, 61

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
　136 S. Ct. 1989 (2016) .................................................................*passim*

*Vermont v. MPHJ Tech. Invs., LLC*,
　803 F.3d 635 (Fed. Cir. 2015) .............................................................11

*Winter ex rel. United States v.*
*Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
　953 F.3d 1108 (9th Cir. 2020) .............................................................53

*Xitronix Corp. v. KLA-Tencor Corp.*,
　757 F. App'x 1008 (Fed. Cir. 2019) .....................................................10

*Xitronix Corp. v. KLA-Tencor Corp.*,
   882 F.3d 1075 (Fed. Cir. 2018) ............................................................... 9

*Xitronix Corp. v. KLA-Tencor Corp.*,
   916 F.3d 429 (5th Cir. 2019) ................................................................. 10

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
   433 F.3d 1199 (9th Cir. 2006) ............................................................... 66

## Administrative Adjudications

*GeneriCo LLC v. Dr. Falk Pharma GmbH*,
   2017 WL 2211672 (P.T.A.B. May 19, 2017) ........................................ 28

## Statutes

28 U.S.C. § 1291 ............................................................................................ 1

31 U.S.C. § 3729(a)(1)(A) ............................................................................ 66

31 U.S.C. § 3729(a)(1)(B) ....................................................................... 66, 68

31 U.S.C. § 3729(a)(1)(C) ............................................................................ 66

31 U.S.C. § 3729(b)(1) ............................................................................. 8, 68

31 U.S.C. § 3729(b)(4) ....................................................................... 8, 54, 68

31 U.S.C. § 3730(c)(2)(A) ............................................................................ 21

31 U.S.C. § 3730(e)(4)(A) ...................................................................... 12, 40

31 U.S.C. § 3730(e)(4)(A)(i) ........................................................................ 27

31 U.S.C. § 3730(e)(4)(A)(ii) ....................................................................... 32

31 U.S.C. § 3730(e)(4)(B) ............................................................................ 13

31 U.S.C. § 3732(a) ...................................................................................... 62

35 U.S.C. § 314(a) ........................................................................................ 30

## Legislative Materials

145 Cong. Rec. E1546-01 (daily ed. July 14, 1999) ................................. 14

S. Rep. No. 99-345 (1986) ....................................................................... 14

S. Rep. No. 110-507 (2008) ...................................................................... 14

## Regulations

37 C.F.R. § 1.11(a) ................................................................................... 37

37 C.F.R. § 42.2 ....................................................................................... 29

37 C.F.R. § 42.4(a) ................................................................................... 30

## Rules

Fed. R. Civ. P. 9(b) ........................................................................ *passim*

## Other Authorities

Stuart Graham et al., *The USPTO Patent Examination
   Research Dataset: A Window on the Process of Patent
   Examination* 17 (USPTO Economic Working Paper No. 2015-
   4, Nov. 2015) ...................................................................................... 37

USPTO, PAIR FAQs, https://www.uspto.gov/patents/apply/
   checking-application-status/pair-faqs#type-browse-faqs_344
   (last visited Mar. 30, 2021) ................................................................ 37

Zachary Silbersher replies to defendants-appellees' answering brief (Def. Br.) and responds to the cross-appeal brief (Falk Br.) of Dr. Falk Pharma GmbH (Dr. Falk). Undefined acronyms have the meanings given in Silbersher's opening brief (OB).

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction under 28 U.S.C. § 1291. Dr. Falk argues for jurisdiction in the Federal Circuit. This contention is addressed in Argument Part I.

## STATEMENT OF THE CASE

In response to Dr. Falk's statement: As Dr. Falk acknowledges, it acquired the rights to the '688 Patent application in 2011, and it owned those rights when alleged false statements to the USPTO were made in 2014. Falk Br. 5; 2-ER-154, 163; SER-25–27, 50. After the patent issued, Dr. Falk licensed it to Salix Pharmaceuticals (a California corporation and subsidiary of defendant Valeant Pharmaceuticals International), to facilitate sales of Apriso in the United States. Falk Br. 5-6; 2-ER-154; SER-50, 57. Dr. Falk not only facilitated U.S. sales of Apriso at monopoly prices (through its licensing agreement), but also sued generic competitors in U.S. courts to block them from entering the U.S. market

for mesalamine, preserving and extending defendants' unlawful U.S. Apriso monopoly. Falk Br. 6-7; 2-ER-149–50, 161, 175–76. That monopoly caused the U.S. Government and plaintiff States to pay inflated prices for Apriso, in violation of the federal and state FCAs. It is a fair inference that Dr. Falk's license agreement entitles it to royalties from these U.S. sales.

The district court held that Silbersher's complaint pleads specific personal jurisdiction because Dr. Falk was "assigned ownership rights under United States law for the mesalamine patent at issue," and has "vigorously asserted those rights by bringing suit against multiple generic drug makers for patent infringement." 1-ER-22. These were clear examples of Dr. Falk purposefully availing itself of the privilege of conducting activities within the United States and invoking the benefits and protections of its laws. *Ibid*. This conduct was "a critical part of the alleged scheme" to fraudulently obtain the '688 Patent and use it to inflate the price the Government paid. *Ibid*.

Dr. Falk cross-appealed from that order.

## SUMMARY OF ARGUMENT

I.    This Court, and not the Federal Circuit, has appellate jurisdiction over this case, which arises under the FCA, and not under the doctrine of inequitable conduct (a judge-made affirmative defense to patent infringement). Because the FCA (and not patent rules) governs Silbersher's claim, and because the resolution of this case will not affect the ownership or enforcement of any patent (because the '688 Patent has been conclusively deemed invalid), this case does not raise a substantial issue of patent law, and jurisdiction properly belongs here.

II.    The public disclosure bar does not compel dismissal. Defendants urge the Court to do exactly what it shouldn't: Interpret the enumerated channels of disclosure as broadly as possible; construe "allegations or transactions" as expansively as possible; and circumscribe the original source exception as narrowly as possible. All this in an effort to throw out a case the Government never would have found or brought on its own, and which otherwise stands to return many millions of dollars to the federal and state treasuries while helping reduce the price of prescription drugs. None of defendants' arguments are supported by the

3

text of the statute, and its amendment history makes clear that Congress intended to authorize suits like this one.

The *GeneriCo* IPR was not a qualifying public disclosure. It revealed only that the patent was invalid, and perhaps that Dr. Falk was involved in the Brunner and Marakhouski studies. The Law360 article summarizing the IPR decision is even less revealing. Neither source discloses the actual withholding of Brunner and Marakhouski. Neither discloses multiple additional false statements to the USPTO during patent prosecution. And neither mentions the assertion of the patent in sham litigation, misrepresentations to the GSA regarding "fair and reasonable" pricing, or the submission of false claims for payment. Moreover, the IPR was not a qualifying disclosure at all because the Government was not a party to it, and so it is not a covered hearing under the post-2010 public disclosure bar. The district court's decision to the contrary was plainly wrong.

The other asserted disclosures—*i.e.*, the patent prosecution dockets, and the Brunner and Marakhouski studies—likewise do not disclose the relevant transactions, and fall outside the statutory channels.

Even if a qualifying public disclosure occurred, Silbersher is an original source. The statutory definition requires only that a relator have independent knowledge that materially adds to publicly disclosed transactions. Silbersher's work here, which includes finding information outside the public disclosures (often in dense, technical sources), and then synthesizing that information into a coherent picture of the fraud, amply qualifies him to take this case forward.

III.    The complaint pleads violations of the FCA. It pleads falsity under the theories of promissory fraud and implied false certification. Defendants fail to address promissory fraud. Under this theory, the fraud on the USPTO tainted the subsequent claims for payment. The complaint plainly alleges false statements to the USPTO, which led to the Government overpaying for Apriso.

Regarding implied false certification, the complaint alleges that defendants certified to the GSA that Apriso's price was "fair and reasonable," thus facilitating claims for payment at prices based on that input that were implicitly false. Defendants have no good explanation for why a company can deceive the Government into granting an unlawful

monopoly, and then lawfully call the resulting inflated monopoly price "fair and reasonable."

The complaint also pleads materiality, which exists when a defendant's violations have a natural tendency to influence, or be capable of influencing, the payment or receipt of money. It is black-letter law that violations that cause the Government to pay more than it should for goods are material.

Silbersher's complaint also complies with Federal Rule of Civil Procedure 9(b). The complaint pleads the key facts—*i.e.*, defendants' false statements, and the way they used the '688 Patent to overcharge the Government—with particularity, giving defendants ample notice of the charges against them and enabling them to respond.

IV.   Dr. Falk is not entitled to dismissal. Dr. Falk's jurisdiction argument is that even when a foreign corporation acquires a U.S. patent, licenses that patent to a U.S. company, asserts that patent in U.S. courts against other U.S. companies to block them from selling generic drugs to U.S. customers, all to reap monopoly profits from U.S. payors, including the U.S. Government, the foreign company lacks the requisite minimum contacts with the United States to be held liable in a suit alleging that

6

its patent monopoly is unlawful. This argument does not pass the smell test. Under recently decided Supreme Court precedent and longstanding circuit precedent, the district court correctly held that it has jurisdiction over Dr. Falk.

On the merits, Dr. Falk's conduct was a crucial part of the alleged fraudulent scheme. By causing false statements to be made, and false claims to be presented, Dr. Falk violated the FCA. Dr. Falk's attempt to seek refuge in the nuances of inequitable conduct law fails because that doctrine does not govern FCA liability, and Dr. Falk misconstrues the doctrine in any event.

## ARGUMENT

### I. This Court Has Appellate Jurisdiction

Dr. Falk contends that the Federal Circuit has exclusive jurisdiction over this appeal because "Silbersher's claimed right to relief necessarily depends on resolution of a substantial question of federal patent law," specifically application of the affirmative defense to infringement called "inequitable conduct." Falk Br. 17; *see Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988). That is incorrect.

7

This case does not involve inequitable conduct, which is a judge-made affirmative defense to patent infringement that precludes enforcement of a patent when false statements, made with "specific intent to deceive the PTO," are the "but-for" cause of the issuance of a patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290-91 (Fed. Cir. 2011).

Instead, the FCA has its own standards for intent and materiality, which require "no proof of specific intent to defraud," 31 U.S.C. § 3729(b)(1), and eschew but-for causation, *see id.* § 3729(b)(4); *United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). Courts have no power to ignore the words Congress used merely because the fraud involved a patent application.

The difference in standards also makes sense. Inequitable conduct is subject to strict standards because it invalidates property rights—potentially even with respect to an entire patent family and claims not directly tainted by such conduct. *See Therasense*, 649 F.3d at 1288 (referring to inequitable conduct as the "atomic bomb" of patent law). The FCA, by contrast, is a deliberately capacious remedial statute designed

8

to protect the public fisc from fraud. It would be contrary to the text and purpose of the FCA to import inequitable conduct doctrine into FCA cases. It is also unnecessary, because FCA liability would not legally affect the enforceability of any patent.

Indeed, because the '688 Patent has already been conclusively invalidated by the Federal Circuit, resolution of this FCA action will have no effect whatsoever on the "ownership, validity [or] enforceability" of the patent (Falk Br. 16), nor on the development of patent law.

Precedent favors our view. This Court has already adjudicated a public disclosure bar appeal in a case alleging fraud on the USPTO. *See Amphastar Pharms. Inc. v. Aventis Pharma SA*, 856 F.3d 696, 704 (9th Cir. 2017). *Amphastar* at least implicitly stands for the proposition that appeals like this one belong here.

The Federal Circuit would agree. In *Xitronix Corp. v. KLA-Tencor Corp.*, 882 F.3d 1075, 1078 (Fed. Cir. 2018), the court held that it lacked jurisdiction over an appeal involving antitrust claims alleging that a fraudulent patent was used to suppress competition. The court stated that there is "nothing unique to patent law about allegations of false statements." *Id.* at 1077.

9

The Fifth Circuit, disagreeing, transferred the appeal back to the Federal Circuit, reasoning that the standard for such antitrust claims is "'virtually congruent'" with inequitable conduct, and that the "case concerns a patent that is currently valid and enforceable" such that the court's decision potentially could render it unenforceable. *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 439, 441 (5th Cir.) (citation omitted), *cert. denied*, 140 S. Ct. 110 (2019).

The Federal Circuit rejected the Fifth Circuit's reasoning. *Xitronix Corp. v. KLA-Tencor Corp.*, 757 F. App'x 1008, 1009 (Fed. Cir. 2019) (per curiam). The court nevertheless decided to accept the transfer rather than sending the case back a second time, concluding that the transfer order, while "flaw[ed]," was "not implausible." *Id.* at 1010.

This case is far easier than *Xitronix* because the legal standard for FCA claims is different from inequitable conduct, and the patent has already been invalidated, so any question of patent law is backward-looking and insubstantial. This Court has jurisdiction under either the Federal or the Fifth Circuit's reasoning.

Dr. Falk's cases are distinguishable. *Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350 (Fed. Cir. 2013), involved a special rule

applicable when the district court dismisses patent claims without prejudice and then decides non-patent claims. Such dismissals divest the Federal Circuit of appellate jurisdiction if the parties are in the same position they would have enjoyed had the patents never been asserted. Because the district court in *Allergan* had resolved an infringement claim on the merits, that was not the case, and so the Federal Circuit took jurisdiction. Here, infringement was never asserted, and the Federal Circuit has already confirmed the patent's invalidity.

Dr. Falk's reliance on *Vermont v. MPHJ Technology Investments, LLC*, 803 F.3d 635 (Fed. Cir. 2015) is similarly misplaced. That case involved a counterclaim alleging that patent law preempted the Vermont Consumer Protection Act. *Id.* at 641. The Federal Circuit recognized that it generally has jurisdiction over such claims. *Id.* at 643. The court then applied the four-factor test from *Gunn v. Minton*, 568 U.S. 251 (2013), and found that the case necessarily raised substantial issues of patent law. Here, no preemption counterclaim has been asserted, and no substantial question of patent law has been raised or disputed. Rather,

the issues here concern the interpretation and application of the FCA. Jurisdiction therefore belongs here.[1]

## II.    The Public Disclosure Bar Does Not Compel Dismissal

The public disclosure bar is only triggered if "substantially the same allegations or transactions as alleged in" Silbersher's complaint "were publicly disclosed" in one of the three enumerated channels, and if Silbersher is not an "original source." 31 U.S.C. § 3730(e)(4)(A). Defendants have not shown this.

### A. Defendants' Arguments About the History and Purpose of the Public Disclosure Bar Amendments Lack Merit

Defendants include a misleading discussion of the history of the public disclosure bar that calls out for correction. First, defendants contend that the shift from "based upon" to "substantially the same" was designed to *broaden* the bar (Def. Br. 8)—but as the Sixth Circuit has explained, the opposite is true.

Under the old statute, claims were sometimes deemed barred if they were "even partly based upon" publicly disclosed transactions.

---

[1] If the Court disagrees, the proper course is to transfer, not dismiss, this appeal. *Amity Rubberized Pen Co. v. Mkt. Quest Grp. Inc.*, 793 F.3d 991, 996 (9th Cir. 2015).

*United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 851 (6th Cir. 2020). The amended language "demands a greater degree of similarity between the *qui tam* complaint and the prior disclosures than 'based upon' does"—and there is no longer any "textual hook" for the "even-partly-based-upon" rule. *Ibid.* Accordingly, under the current statute, a disclosure occurs only if all of the "essential elements" of the alleged fraud have been disclosed. *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 918 (6th Cir. 2017).

Defendants next argue that the 2010 amendments "narrowed the 'original source' exception." Again, the opposite is true: Congress "radically changed" the statute to "lower the bar for relators." *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 298-99 (3d Cir. 2016). The old standard—which required "direct and independent knowledge"—had been interpreted to require relators to have firsthand factual knowledge about the fraud to claim original source status. Under the new standard, the relator only needs "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B). This is a clear attempt to codify the understanding of Senator Grassley—the modern

FCA's principal architect—that a relator "who uses their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents, should be allowed to file a *qui tam* action." 145 Cong. Rec. E1546-01 (daily ed. July 14, 1999), 1999 WL 495861, at *E1547. While that original understanding was not implemented by the courts after the 1986 amendments, the 2010 language expresses that intent more precisely.

Third, defendants urge the Court to ignore the legislative history described in Silbersher's brief. Def. Br. 9-12. But courts have cited the same sources when interpreting the statute. *See, e.g.*, *Bourseau*, 531 F.3d at 1168 (citing S. Rep. No. 99-345 (1986)); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170-71 (9th Cir. 2006) (same); *United States ex rel. Banigan v. PharMerica, Inc.*, 950 F.3d 134, 146 n.16 (1st Cir. 2020) (citing S. Rep. No. 110-507 (2008) to interpret public disclosure bar); *United States ex rel. Yannacopolous v. Gen. Dynamics*, 315 F. Supp. 2d 939, 950 (N.D. Ill. 2004) (citing 145 Cong. Rec. E1546-01 (1999) to interpret public disclosure bar).

Ignoring these sources also makes no sense. Senator Grassley is the architect of the 1986 public disclosure bar. Between 1986 and 2010,

Grassley lamented that courts had interpreted the bar too broadly, and the original source exception too narrowly. In 2010, Congress radically changed the statute to make it more relator-friendly. While the views of a single legislator are not controlling, this Court has not hesitated to rely on statements by the authors of legislation. *See, e.g.*, *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 859 (9th Cir. 2017); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, 833 F.3d 1125, 1132 (9th Cir. 2016); *United States v. Guillen-Cervantes*, 748 F.3d 870, 873 (9th Cir. 2014). It would be a mistake to ignore the perspective of the most knowledgeable and consistently engaged legislator on this law.

Moreover, although defendants claim that the legislative history is conflicted and unclear, they cite nothing from it to support their own made-up policy arguments. And there should be no doubt that defendants are trying to put an atextual gloss on the statute. They use loaded terms like "serial relator," "windfall," and "opportunistic" to give the misimpression that the FCA is designed only to permit claims by

insiders.[2] The district court exhibited the same bias, but it has no basis in the FCA's text or history. The opening brief proved this, OB36-41, as did the amicus brief of the Taxpayers Against Fraud Education Fund, Doc. 27, at 3-14. Indeed, all evidence shows that Congress wants knowledgeable outsiders like Silbersher to bring FCA actions and join the fight against fraud on the Government.

---

[2] Defendants also parrot baseless allegations of impropriety made by putative amicus Flat Line Capital (FLC). Def. Br. 20 n.3. And amicus Johnson & Johnson argues that the mere potential for such issues disqualifies patent lawyers from serving as relators. Doc. 48, at 32-35. We debunked these arguments thoroughly in opposition to FLC's now-denied intervention motion, explaining that the allegations against Silbersher are lies by a disgruntled former client who has himself committed egregious misconduct, including falsehoods and threats. Doc. 39-1, at 9-20. Ethics expert Professor W. Bradley Wendel of Cornell University confirmed that Silbersher committed no ethical violations. *See generally* Doc. 39-2.

Moreover, both we and amicus Taxpayers Against Fraud Education Fund explained that any alleged ethical issues have no bearing on the FCA's cause of action, the public disclosure bar, or the original source exception; such issues should of course be resolved in appropriate tribunals, but not abused in an FCA case to deny redress for fraud on the Government. Doc. 39-1, at 5-9; Doc. 27, at 14-18 (citing multiple cases involving lawyer relators). Defendants do not even attempt to grapple with this comprehensive response. This Court should not dignify this concern any further.

**B. The *GeneriCo* IPR Is Not a Qualifying Public Disclosure**

The *GeneriCo* IPR did not trigger the bar because it did not disclose substantially the same allegations or transactions as Silbersher's complaint; and it did not fall within enumerated channels of disclosure.

> *1. The* GeneriCo *IPR Did Not Disclose Substantially the Same Allegations or Transactions as Alleged in Silbersher's Complaint*

Defendants attempt to equate the IPR with this *qui tam* case. That is wrong. The IPR did not disclose substantially the same allegations or transactions as Silbersher's complaint, let alone all of them. OB48-52. It disclosed, at most, that the '688 Patent was obvious, and that Dr. Falk knew about the studies that made it so. But the IPR does not reveal that defendants deceived the USPTO into granting the '688 Patent, let alone duped the Government into overpaying for Apriso. Accordingly, it does not reveal key elements of the fraud.

First, we address defendants' contention that Silbersher's counsel waived this point below, which is based on a misreading of the argument transcript. Def. Br. 24-25. The district court asked whether the PTAB proceeding triggered the public disclosure bar, and counsel stated that he wished to "react three ways." 2-ER-41. He had just begun his first point,

which was that the 2010 amendments narrowed which disclosures could trigger the bar. Counsel said that "[b]efore 2010, there would be no case," but the 2010 amendments changed that. *Ibid*. The district court then cut him off, and counsel never had a chance to offer a complete explanation. At other points in the argument, however, counsel clearly rejected the premise that all of the transactions had been disclosed. Thus, he began by arguing that defendants "cannot show a substantially similar allegation or transaction, even if you did consider their sources to be enumerated within the statute." 2-ER-37. And he expressly argued that "[t]he '344 patent," which forms an independent basis for fraud in Silbersher's complaint, "was never mentioned in the PTAB case." 2-ER-51.

Defendants misread the admission that there would have been no case prior to 2010 as an admission that the PTAB's decision, alone, disclosed every transaction in Silbersher's complaint. As shown above, counsel expressly denied that. Instead, there was no viable case before 2010 because *both* the PTAB's decision *and* the patent prosecution dockets would have been considered public disclosures, *and* the bar could have been triggered even if the case was only partly based upon public

disclosures; *and* original sources were required to have direct factual knowledge of fraud. The 2010 amendments changed all of that.

This Court should not lightly infer waiver of an argument—let alone an entire "case"—based on an ambiguous sentence from the argument transcript. *See, e.g.*, *Goodman v. Lee*, 988 F.2d 619, 624 (5th Cir. 1993) (per curiam) (refusing to find waiver when counsel's statements at oral argument were "ambiguous and equivocal"). The Court should accordingly consider Silbersher's argument on the merits. Even if the Court credits defendants' rendition of the transcript, it should decide this question because the Court's review is *de novo*, and the issue has been fully briefed by both sides. *See Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 281 n.19 (7th Cir. 2016) (addressing a similar argument despite explicit waiver below).

On the merits, Silbersher's argument is a winner. The PTAB did not disclose at least four important sets of facts: (1) defendants' failure to disclose the Brunner and Marakhouski studies to the USPTO during prosecution of the '688 Patent; (2) defendants' other material false statements during patent prosecution; (3) defendants' scienter; and (4)

19

the facts connecting the '688 Patent to the presentment of false claims. OB51-52.

Defendants do not even address the first fact—that the PTAB's decision does not reveal that defendants withheld the Brunner and Marakhouski studies during patent prosecution—but it is critical. Without this element, the invalidation of the '688 Patent does not suggest deception. It would be equally possible that defendants had disclosed the studies to the USPTO, which misapprehended their import and mistakenly granted the patent. In that circumstance, the patent would be invalid, but there would be no fraud. As the opening brief explained, thousands of IPRs have resulted in the cancellation of at least one patent claim. OB18-19, 38-39. In the vast majority of those cases, there was no fraud—and so invalidity on its own is the sort of "innocuous information" that does not trigger the public disclosure bar. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 657 (D.C. Cir. 1994).[3] The fraud only arose because defendants withheld the studies.

---

[3] This answers amicus Johnson & Johnson's policy argument against allowing FCA cases based on invalid patents. Doc. 48, at 29-31. Concerns about floodgates are exaggerated because invalidity and fraud are not

This is analogous to *Ibanez*. There, the relator alleged unlawful off-label promotion of a drug, which led eventually to false claims being submitted. *See* 874 F.3d at 919. The court reasoned that the "first link in the chain—the improper promotion of the drug," was "crucial" because "even if the scheme's other elements were publicly disclosed," the public disclosure bar would be "implicated only if that conduct is somehow tied back to improper promotion." *Ibid*. Without "disclosure of this key element," "no fraud was publicly disclosed." *Ibid*. The same is true here. The withholding of studies during patent prosecution was the crucial first link in the chain—and the IPR did not disclose it. This is dispositive, and defendants tellingly say nothing about it.

With respect to the second fact, defendants concede that other false statements in the '688 Patent prosecution history, including statements contradicting the prosecution of the '344 Patent, were not disclosed—but minimize these by saying that "Silbersher only alleges that the

---

synonymous. The Government also has tools to close the gates by blocking cases that undermine its policy objectives. *See* 31 U.S.C. § 3730(c)(2)(A). Moreover, without actions like this one, there is no good way to make the Government whole when, as here, fraudulently obtained patents impose massive costs on taxpayers. OB63.

prosecution history of the '344 Patent" was merely "cumulative" evidence of scienter. Def. Br. 28.

That is a blatant mischaracterization of the complaint, which treats these false statements not merely as evidence of scienter, but instead as independent false statements used to obtain the '688 Patent, *i.e.*, a violation separate from the withholding of the Brunner and Marakhouski studies. 2-ER-164–69. When defendants prosecuted the '344 Patent, they told the USPTO that one would ordinarily take mesalamine without food, claiming that taking it with food was inventive. 2-ER-165. Five years later, the same inventor and same lawyer prosecuted the '688 Patent and made the exact opposite claim—and in the process withheld relevant data that had been submitted in the '344 patent prosecution. 2-ER-165–66. They also withheld information about other mesalamine drugs. 2-ER-166–68. This deception had nothing to do with the Brunner and Marakhouski studies, and it was not at issue in the IPR. *See* OB50-51 (citing cases holding that different methods of fraud constitute different transactions).

Defendants argue that the disclosure regarding the studies was enough to put the Government on notice of the alleged fraud, and so all

the other misrepresentations are merely cumulative. Def. Br. 29. There are two problems with this argument. First, as explained above, the withholding of the studies was not actually disclosed. Second, defendants' argument takes the fraud at too high a level of generality. *See* OB50-51 (citing cases). Indeed, defendants do not even attempt to explain how knowing about the withholding of the studies would have exposed false statements about the '344 Patent and the other mesalamine drugs, and there is no reason to think that it would have. Those two deceptions are separate, such that disclosure of one does not reveal the other.

With regard to the third fact—scienter—defendants argue that because the PTAB disclosed that the co-authors of Brunner and Marakhouski were affiliated with Dr. Falk, anybody could infer that defendants withheld the studies knowingly. Def. Br. 26-27. They argue that any other evidence of scienter is merely "cumulative."

This is disingenuous. First, as explained above, there is nothing "cumulative" about allegations alleging different false statements altogether. Second, the authorship of the Brunner and Marakhouski studies, while inculpatory, is hardly a smoking gun (especially against defendants other than Dr. Falk). Thus, additional allegations

23

establishing scienter are valuable because "False Claims Act cases often turn on the issue of scienter." *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 760 (10th Cir. 2019) (quotation marks omitted). Courts evaluate the weight of scienter allegations collectively. *Cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). Here, each act of deception matters because the more there are, the less likely it is that defendants' conduct was innocent. Accordingly, these allegations cannot be disregarded as "cumulative." *See Reed*, 923 F.3d at 761 ("[W]hen a relator brings forth knowledge of scienter that is not specifically contained in a qualifying public disclosure it should be presumed to materially add value.") (quotation marks omitted).

The cases defendants cite are not to the contrary. In each one, the public disclosures were far more explicit than here. And in each one, the relator merely took publicly disclosed wrongdoing and alleged knowledge without adding material facts. *See United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623, 626-27 (9th Cir. 2018) (finding public disclosure when relator merely added "legal boilerplate" and immaterial details to publicly disclosed allegations); *Cause of Action*, 815 F.3d at 269-70, 282 (finding disclosure when relator merely repackaged

publicly disclosed audit into an FCA complaint without doing "any independent investigation or analysis"); *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 719-20 (7th Cir. 2017) (same when relator tacked "conclusory allegation[s]" onto publicly disclosed facts); *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 469 (D.C. Cir. 2016) (finding public disclosure when defendant's unlawful practice (selling overpriced cigarettes) had been publicly disclosed, and relator merely added specific examples that were subsets of the publicly disclosed transaction).

This case is different. Here, Silbersher conducted additional investigation beyond the IPR; uncovered facts that were neither discussed in the IPR nor duplicative of issues raised there; and distilled those facts into allegations that are not conclusory, but are instead well-pled facts that identify discrete material false statements, which also reinforce the critical element of scienter. No case suggests that a court should disregard such allegations as "cumulative."

Finally, the PTAB decision never discloses the causal chain of events leading from the '688 Patent to false claims for payment. It says nothing about how the patent was the key to blocking generic competition

25

from Apriso, how the price of Apriso was affected, the false certifications

that the price was fair and reasonable, or the Government's payments.

Defendants argue that these inferences are obvious, relying on

*Amphastar*. *See* Def. Br. 29-30. That was a very different case. There, the

publicly disclosed complaint:

> accused Aventis of obtaining an invalid patent due to
> misrepresentations. It also claimed that, despite knowing
> about these misrepresentations, "Aventis has attempted to
> maintain or obtain a monopoly over others" by doing things
> such as improperly listing the Patent in the Orange Book.
> Finally, it alleged that "Aventis has wrongfully derived, and
> will continue to wrongfully derive, income and profits from
> this conduct."

856 F.3d at 704. Once these facts had been disclosed, the Court deemed

it an "obvious inference" that "the government also bought the drug while

Aventis held its illegal monopoly." *Ibid*. Here, none of that causal chain

was disclosed in the IPR—and defendants have no authority for the

proposition that false claims to the Government are an "obvious"

inference any time a patent is deemed invalid.

> 2. *The* GeneriCo *IPR Was Not a Hearing in Which the
> Government was a Party*

Under romanette (i) of the amended public disclosure bar, "a

Federal criminal, civil, or administrative hearing" is an enumerated

channel, but only if "the Government or its agent is a party." 31 U.S.C. § 3730(e)(4)(A)(i). Congress added the Government-party limitation in 2010 to narrow the range of hearings that would trigger the bar.

For the first time on appeal, Defendants argue that the Government is a party to IPRs. As the district court noted, defendants forfeited this argument. 1-ER-16; *see also* 2-ER-45 (defense counsel stating that romanette (i) was "beside the point"). That forfeiture was wise.

Defendants do not dispute that in romanette (i), "party" means a "litigant," as opposed to an adjudicator. OB47. The Government did not participate as a litigant in the *GeneriCo* IPR; it only participated as an adjudicator. Thus, it never did anything litigants do, e.g., entered appearances, made an argument, sought discovery, or supported a side. Instead, the Government's only role was to adjudicate arguments presented by the actual parties.

The record of the *GeneriCo* proceedings reflects that the Government was not regarded as a "party." The Government was not named in the caption—either in the PTAB or on appeal. Documents referring to the "parties" (*e.g.*, stipulations regarding scheduling orders),

referred only to the private parties, and were only served on the private parties. And the PTAB's final written decision includes the word "parties" six times, each time referring only to the petitioner and patent owner, and not the Government. *See GeneriCo LLC v. Dr. Falk Pharma GmbH*, 2017 WL 2211672, at *1, 3-6, 21 (P.T.A.B. May 19, 2017).

That coheres with the general understanding that the Government is not generally a party to IPRs. The Supreme Court has held that the Government cannot itself petition for IPR. *See Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1867 (2019). In the process, the Court explained that Congress did not "authorize[] the Government . . . to become a party to a full-blown adversarial proceeding before the Patent Office and any subsequent appeal." *Id.* at 1866. Similarly, in *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018), the Court explained that "Congress opted for a party-directed, adversarial process," as opposed to an "agency-led, inquisitorial process." Here, the use of the word "party" refers clearly to private parties, as distinct from the Government.

The administrative rules governing trials before the PTAB, codified at 37 C.F.R. Part 42, likewise distinguish between the "parties" to a

proceeding, on the one hand, and the "Board," *i.e.*, the Government, on the other. For example, the definition of a "party" includes "the petitioner" and "the patent owner," but not the Board or the Government. 37 C.F.R. § 42.2. Throughout the rules, references to "parties" plainly refer only to the private parties, distinguishing them from the Government.

Against all this, defendants identify three characteristics of IPRs that they say compel the opposite conclusion. Def. Br. 34-35. First, an IPR cannot be instituted unless the Director so decides. Second, the PTAB has the power to issue a decision, and the Director can participate in appeals, even if the private parties drop out. Third, the Federal Rules of Civil Procedure do not apply in IPRs, and the patent owner can amend its claims in the middle of an IPR. In support of these contentions, defendants rely on non-binding precedents holding that because IPRs are a mechanism for the USPTO to reconsider its prior grant of a patent, they are analogous to enforcement actions, such that the sovereign immunity of tribes and States does not block IPRs.

These arguments are unpersuasive. Sure, the Director has discretion to institute an IPR. But the Director delegated this decision to

29

the administrative judges of the PTAB. *See* 37 C.F.R. § 42.4(a). These judges make institution decisions by applying the statutory criteria that IPR can be instituted if, based on the parties' initial filings, "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged." 35 U.S.C. § 314(a). Thus, at the institution stage of every IPR, a panel of judges evaluates the strength of the parties' arguments and weeds out weak cases—much like a court ruling on a motion to dismiss. That is adjudicator behavior, not litigant behavior, and so actually refutes the contention that the Government is a "party." Moreover, the Supreme Court clarified that the Director does not have discretion "to initiate whatever kind of inter partes review he might choose"; instead, the Director has "a binary choice—either institute review or don't," on terms provided by the petitioner. *SAS Inst.*, 138 S. Ct. at 1355. A "party" would have at least some control over which claims are presented—but the Government has none.

Defendants' second argument is similarly wrongheaded. The fact that the PTAB has the power to issue decisions even if private parties drop out does not make the Government a party, because deciding a case does not turn the adjudicator into a litigant. The fact that the Director

30

can participate in certain appeals is also irrelevant—at least in cases, like *GeneriCo*, where the Director did no such thing.

Third, that the Federal Rules of Civil Procedure do not apply, or that patent owners can amend their claims, do not speak to whether the Government is a party. Those points are logically irrelevant to the Government's status.

Finally, defendants are wrong to suggest that treating IPRs as qualifying disclosures is good policy. As the opening brief explained, parties cannot even assert fraud in IPRs. And there is no evidence that fraud investigators look to IPRs for evidence of wrongdoing, and no reason to sweep those proceedings into the public disclosure bar. Indeed, the State of California recently said as much in a similar case. There, the State explained that:

> Mr. Silbersher's suits are neither "parasitic" nor "opportunistic." We are not aware of any government agency that regularly monitors patent filings to determine whether there has been a material omission or misrepresentation in applications for pharmaceutical patents, particularly given the specialized expertise and amount of resources that would be required to do so. We therefore welcome the efforts of relators like Mr. Silbersher to help identify instances where drug patents are not just invalid, but fraudulent—particularly in a case like this, where there was apparently no pre-existing government investigation concerning the alleged fraud. Such efforts, if successful, may help lower the price of

medicine and the cost of health insurance, which is consistent with our mission.

Statement of Interest on Behalf of the State of California, by and Through the Cal. Ins. Comm'r, *United States ex rel. Silbersher v. Allergan PLC*, No. 18-cv-03018-JCS, ECF 133, at 3 (N.D. Cal. June 8, 2020) (footnote omitted).

### 3. The GeneriCo *IPR Was Not a Qualifying Hearing Under Romanette (ii)*

Romanette (ii) provides that the bar can be triggered by disclosures "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation." 31 U.S.C. § 3730(e)(4)(A)(ii). Defendants argue that romanette (ii) applies to every "Federal . . . hearing," whether the Government is a party or not, and therefore applies to IPRs. Def. Br. 36-39; Falk Br. 37-41. Their principal contention is that the statutory text is unambiguous. That is wrong.

The opening brief explained that if romanette (ii) is read the way defendants want, it would render romanette (i) completely superfluous because if *every* federal hearing falls under romanette (ii), then romanette (i), which applies to only a subset of federal hearings, does no work. OB44-45. Defendants do not deny this, but say that redundancy is

no big deal. Def. Br. 38. The problem with defendants' interpretation is not simple redundancy; it is that they read out an entire subsection of the statute, nullifying a recent amendment in the process. That is impermissible. OB45 (citing controlling cases). The correct reading is that romanette (ii) applies only to hearings that are not specifically covered by romanette (i). OB46. That gives meaning to every provision of the statute and achieves Congress's purposes.

Dr. Falk also argues that by removing the word "administrative" from romanette (ii) and adding the word "Federal," Congress broadened the scope of that provision in 2010. Falk Br. 36-37. That is plainly not the best way to read the amendment. The addition of "Federal" was designed to narrow romanette (ii) by carving out reports, hearings, audits, and investigations conducted by state and local entities; it was not designed to expand the provision to cover more federal hearings. The removal of the word "administrative" was to eliminate redundancy with romanette (i), making it clear that if a hearing is an "administrative" hearing, the place to look is romanette (i), and not romanette (ii). Because the IPR is an administrative hearing, romanette (ii) does not cover it.

## C. The Law360 Article Summarizing the *GeneriCo* IPR Is Not a Qualifying Public Disclosure

We have little to add to the opening brief's discussion of the Law360 summary of the PTAB's decision. OB52-54. The summary discloses far less than the decision itself. It never mentions or discusses Brunner and Marakhouski, let alone claims of deception or withholding of prior art, or facts connecting the '688 Patent to overcharging the Government.

The only point worth answering specifically is that the article incorporated the PTAB decision by reference, thus rendering that decision a disclosure from "the news media" even if the decision is not a "hearing." Def. Br. 40. This is another new argument on appeal, and it is unsupported in the record (*see* the article at 2-ER-141–42, which includes no obvious link to the PTAB's decision). The argument also makes no sense here. The article does not suggest any misrepresentation, fraud, or false claims, and so nobody interested in those issues would ever think to go from the article to the PTAB's decision. Defendants should not be able to bootstrap the PTAB's discussion into the case *via* a hyperlink in an innocuous news article. Because the article was the only disclosure actually "from the news media," the Court should limit its analysis to the article—which says almost nothing.

## D. The Patent Prosecution Dockets Are Not Qualifying Public Disclosures

Defendants reach for additional disclosures that the district court did not find, including the patent prosecution dockets for the '688 and '344 Patents. Defendants argue that these are "Federal reports" under romanette (ii) because they are maintained on a Government database called Public PAIR.

As the opening brief explains, the prosecution histories do not disclose that the Brunner and Marakhouski studies were relevant prior art, nor that defendants knew about the studies, nor facts about false claims. Alone, they cannot trigger the public disclosure bar. OB60. Defendants do not appear to argue otherwise.

PAIR also does not fall under romanette (ii). As explained in the opening brief, patent prosecution is an administrative hearing addressed by romanette (i), and deliberately excluded from that provision because it is an *ex parte* proceeding in which the Government is not a party. OB62. Defendants never dispute this. Thus, once again, defendants are asking the Court to sweep in a proceeding through romanette (ii) that Congress expressly sought to carve out of the public disclosure bar when it amended romanette (i).

35

Doing so would undermine the core of the 2010 amendments. As the opening brief explained, PAIR is the patent system's counterpart to PACER, except much less user-friendly. OB60. Thus, PAIR displays docket sheets from patent prosecutions, with very little descriptive detail, allowing access to patent filings without commentary.

The only court that has considered whether PAIR can trigger the public disclosure bar has rejected defendants' arguments, holding that "in the wake of the 2010 amendments to the public disclosure bar, the disclosures on PAIR are neither 'reports' nor 'news media.'" *Silbersher v. Allergan Inc.*, 2020 WL 7319407, at *18 (N.D. Cal. Dec. 11, 2020), *motion to certify appeal granted*, 2021 WL 292244 (N.D. Cal. Jan. 28, 2021). As the thorough and well-reasoned decision explained, the toughest problem for defendants is that if they are correct that an electronic docket sheet like PAIR qualifies as a "Federal report" or "news media" they have no way to stop PACER from coming in—which is a fatal problem because that interpretation would sweep in every filing in every federal civil action, whether the Government was a party or not. *See id.* at *24. Again, romanettes (ii) and (iii) should not be interpreted to "eviscerate[]" the limitations Congress consciously placed on romanette (i). *Id.* at *19.

36

Defendants try to distinguish PAIR from PACER, but the attempt falls flat. They have only one argument: That while PACER reproduces filings automatically, patent filings are submitted to the USPTO, which reviews the filings before selecting which ones to put on PAIR. *See* Def. Br. 50-51. According to defendants, because the Government is "curating documents" on PAIR, it is different from PACER. *Id*. at 51.

There are two problems with this. First, defendants' description of PAIR is incorrect—there is no "curation" of documents by the Government. By regulation, all papers relating to every issued patent must be published. 37 C.F.R. § 1.11(a). Indeed, defendants' source confirms that "if an application issued as a patent, it is included in PAIR." Stuart Graham et al., *The USPTO Patent Examination Research Dataset: A Window on the Process of Patent Examination* 17 (USPTO Economic Working Paper No. 2015-4, Nov. 2015). Thus, as it relates to documents that might be relevant to whether a patent was obtained by fraud (which are the only relevant documents for FCA purposes), there is no discretion or curating at all. Instead, PAIR provides "real-time status information." *See* USPTO, PAIR FAQs, https://www.uspto.gov/patents/apply/checking-application-status/pair-faqs#type-browse-faqs_344 (last visited Mar. 30,

2021). This includes millions of docket sheets, each almost completely opaque.

Second, defendants' description of PACER is inaccurate because courts often exercise discretion to seal documents or entire dockets. So even if PAIR involves some discretion, that would not provide any material distinction from PACER.

Defendants argue that under the Supreme Court's decision in *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401 (2011), PAIR is a "report" because it "gives information." Def. Br. 46-47. In *Schindler*, the Court concluded that a written response to a FOIA request, prepared by federal employees who were required to "notify the person making such request of [the agency's] determination and the reasons therefor," fell within the ordinary definition of a "report." 563 U.S. at 410 (quotation marks omitted). For two reasons, PAIR dockets are not "reports" under *Schindler*.

First, PAIR and FOIA responses are different in character. FOIA responses are documents prepared by federal employees responding to requests for information. PAIR is not a document at all; it is a labyrinthine virtual trove of millions of documents—and it does not "give

38

information" so much as potentially allow people, who know where to look already, to find information on their own. Documents accessible through PAIR, moreover, are not themselves "Federal reports." The vast majority were written by private parties. As explained above, they are posted online automatically, with no federal employee choosing the information—let alone making or communicating a determination about what information to include. Thus, while courts have sometimes held that a privately prepared document can be part of a "Federal report" when it is included in a document prepared by a federal employee, no court has held that a docket system like PAIR can transform private filings into federal reports. Such filings are no more "Federal reports" than are private civil filings made available on PACER.

Second, *Schindler* arose under the previous version of the statute. In light of the 2010 amendments, *Schindler*'s interpretive methodology compels a different result for PAIR than for FOIA responses. In *Schindler*, the Court held that "to determine the meaning of one word in the public disclosure bar, we must consider the provision's 'entire text,' read as an 'integrated whole.'" 563 U.S. at 408 (citation omitted). The Court stressed that "*all* of the sources [of public disclosure] listed in

§ 3730(e)(4)(A) provide interpretive guidance." *Id.* at 409 (quotation marks omitted) (alteration in original). Under the amended statute, Congress's modifications to romanette (i) must inform the interpretation of romanette (ii)—and those modifications make it impossible to read romanette (ii) as broadly as defendants suggest. *See United States v. Fausto*, 484 U.S. 439, 453 (1988) ("[T]he implications of a statute may be altered by the implications of a later statute."). The right way to apply *Schindler* to the current statute is to hold that whatever else romanette (ii) includes, it does not include the docket sheets of proceedings that are governed by romanette (i). Any other interpretation would sweep in PACER, PAIR, and every other federal docket system, whether the Government is a party or not, in contravention of Congress's amendments. *See Allergan*, 2020 WL 7319407, at *19.[4]

———————————

[4] Johnson & Johnson argues that PACER is different from PAIR because the public has a common law right to access court records, but only a statutory right to access patent records. Doc. 48, at 18-20. This is a distinction without a difference. By law, court records and patent records are public records. Amicus cites no authority for the proposition that the origin of the legal mechanism matters, and we cannot think of any logical reason why it would. If anything, the fact that the public has a more robust right of access to court records ought to make a finding of public disclosure more likely—not less. But obviously, that is not the

### E. The Brunner and Marakhouski Studies Are Not Qualifying Public Disclosures

Defendants do not dispute that, on their own, the Brunner and Marakhouski studies do not disclose any fraud.

The studies also do not count as public disclosures. The best-reasoned cases hold that "the news media" takes its ordinary meaning. *See United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, 2019 WL 3282619, at *13 (C.D. Cal. July 16, 2019), *rev'd on other grounds*, No. 19-56367, ECF 67-1 (9th Cir. Mar. 31, 2021); *Allergan*, 2020 WL 7319407, at *24. This means professionals who focus on reporting news to the public. OB55-56. Under this definition, bimonthly journals about the hepato-biliary system do not qualify because the authors and publishers are not news reporters or companies, and the content is not news.

Defendants argue that scientific journals are "the news media" because they "communicate the latest developments and findings in research and industry to interested audiences." Def. Br. 52. But that

---

case, and nobody thinks PACER is included. PAIR is excluded for the same reason: it is merely a website providing automatic access to records of proceedings covered by romanette (i).

definition would include every person who communicates any "development" to any "interested audience"—including most bloggers, corporate websites, online libraries, and many other resources that nobody would describe as "news media" in ordinary parlance.

The non-controlling cases defendants cite are similarly unpersuasive. They conclude that "the news media" means anything that "disseminate[s] information to the public in a periodic manner." Def. Br. 52 (quoting *United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc.*, 186 F. Supp. 2d 458, 462 (S.D.N.Y.), *aff'd*, 53 F. App'x 153 (2d Cir. 2002)). That is even more capacious—and equally divorced from the plain meaning of the statute because not all "information" is "news," and not every periodic communication is from "the media."

The remainder of defendants' arguments attack straw men. We never argued that the journal in this case was not "news media" solely because the articles are stale, or solely because it has a niche audience. But these factors together, combined with the fact that the authors are scientists (not reporters), and the publisher does not publish *any*

reporting on current events, show why this journal falls outside the ordinary meaning of "news media."

FCA policy also supports our view. The public disclosure bar is meant to stop parasitic lawsuits where the relator adds nothing to information that is already salient to the Government. Dense studies in obscure journals are unlikely to be on the radar of the lawyers in the Department of Justice, and that should matter when the Court considers whether those journals count as "the news media."

### F. Silbersher Is an Original Source

The opening brief explained that if the Court agrees with the district court that the IPR and the Law360 article constituted public disclosures, Silbersher would qualify as an original source because his complaint involves information gleaned from other sources, including the patent prosecution histories, the studies, the Otterbeck patents, the state of the market, and the process for making claims to the Government. OB67-68.

Against these points, defendants argue that the original source allegations in the complaint are not robust enough. But the 2010 bar is an affirmative defense on the merits. *See, e.g.*, *Prather v. AT&T, Inc.*, 847

43

F.3d 1097, 1102 (9th Cir. 2017) (collecting cases). This matters because it is well-settled that a complaint need not anticipate and refute affirmative defenses. *See, e.g.*, *U.S. CFTC v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 158 (2020). And a complaint can only be dismissed on the basis of an affirmative defense "when there is some obvious bar to securing relief on the face of the complaint." *Id.* at 973 (quotation marks omitted). Thus, it is not Silbersher's burden to plead all the facts that might support his claim to original source status (which would be impossible anyway without knowing which public disclosures are at issue); it is defendants' burden to show that, based on the allegations in the complaint, Silbersher cannot be an original source. This they cannot do because the complaint contains many allegations that are not located in the public disclosures that the district court found. That is all independent knowledge that materially adds to those public disclosures.

The opening brief further explained that even if defendants win all of their public disclosure arguments, Silbersher still qualifies as an original source under the statutory definition because it was only his knowledge and expertise that allowed him to connect these disparate

sources of information to form a coherent understanding of how defendants' misconduct caused the Government to overpay for Apriso.

The amendment to the original source provision, which removed the requirement of "direct" factual knowledge, is clearly drafted to open the door to people like Silbersher. Moreover, as the Statement of Interest from the State of California shows, Silbersher's insights and efforts are uniquely valuable to the Government in this context.[5]

## III.  The Complaint Pleads Violations of the False Claims Act

Defendants argue in the alternative that the complaint fails to plead FCA violations. But the complaint is more than adequate. Indeed,

---

[5] After this Court denied its motion to intervene (Doc. 58), FLC filed a proposed *amicus* brief (Doc. 66) ostensibly with respect to the "original source" issue, but really just an attempt to litigate its right as a supposed "Bonified Original Source" to pursue its own *qui tam* action. In addition to misapprehending basic features of the FCA and attempting to circumvent the Court's denial of its motion to intervene, FLC's brief should be disregarded because it offers no useful contribution to this appeal.

We also refer the Court to Silbersher's opposition to FLC's motion to intervene, which details the egregious misconduct of FLC's principal, who among other things (such as lying to the Court) created a fake Twitter account and website impersonating Silbersher to defame and intimidate him—and then threatened Silbersher and his counsel with violence. Doc. 39-1, at 5, 16-20. Professor Wendel's opinion confirmed that Silbersher violated no ethical rules. Doc. 39-2.

this same theory of fraud has now twice survived similar motions. *See Allergan*, 2020 WL 7319407, at *35; *Amphastar Pharms. Inc. v. Aventis Pharma SA*, 2013 WL 12139832, at *3 (C.D. Cal. Apr. 19, 2013), *vacated on other grounds*, 2015 WL 4511573 (C.D. Cal. July 20, 2015), *vacatur aff'd*, 856 F.3d 696 (9th Cir. 2017).

As these cases recognize, in enacting the FCA, "Congress wrote expansively, meaning to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation marks omitted). This Court accordingly construes the FCA "broadly," including to "'attach . . . liability to claims for payment that are not explicitly and/or independently false'" when those claims are part of a fraudulent scheme, or otherwise tainted by antecedent fraud. *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017) (quoting *Hendow*, 461 F.3d at 1171). The fraud in this case meets that description.

## A. The Complaint Pleads Falsity

The complaint alleges falsity under two theories: promissory fraud (sometimes called fraudulent inducement) and implied false certification.

Defendants only ever talk about false certification, ignoring promissory fraud altogether. That deficiency alone is enough to sink their argument.

### 1. The Complaint Pleads Promissory Fraud

Promissory fraud arises when an upstream fraud taints downstream claims for payment. The most common situation is when a defendant obtains a government contract or benefit using false statements. Every claim for payment under the contract violates the FCA, even if the claims are not literally false. *See Campie*, 862 F.3d at 902; *Hendow*, 461 F.3d at 1173.

Promissory fraud is not limited to contracts (or even to "promises"). The Court made this clear in *Campie*, where the relator alleged that the defendant used falsified testing data to deceive the Food and Drug Administration (FDA) into approving a noncompliant manufacturing facility for a drug. 862 F.3d at 896, 899. The Court held that the complaint stated a claim for promissory fraud based on the defendant's "representations to the FDA and labeling of its products." *Id*. at 904. It was irrelevant that the deception was directed at the FDA, as opposed to the paying agencies, because "[i]t is not the distinction between the agencies that matters, but rather the connection between the regulatory

omissions and the claim for payment." *Id.* at 903. Because the upstream conduct was "integral to a causal chain leading to payment," it was "irrelevant how the federal bureaucracy ha[d] apportioned the statements among layers of paperwork." *Ibid.* (quotation marks omitted). The element of falsity was met. *See ibid.*

This case is on all fours with *Campie*. Silbersher alleges that defendants made three sets of false representations to the Government: (1) false representations designed to convince the USPTO that taking certain formulations of granulated mesalamine without food was inventive, when defendants knew otherwise, which induced the USPTO to grant the '688 Patent; (2) fraudulently listing the '688 Patent in the FDA's Orange Book, which delayed the onset of generic competition and led to baseless patent infringement litigation; and (3) representing to the GSA that the price of Apriso was "fair and reasonable" when defendants knew that the price was actually the product of an unlawful monopoly. Each of these misrepresentations was integral to the causal chain that led the Government to pay defendants for Apriso because without the patent, there would have been no monopoly to prop up the price, and without the pricing representations, the drug could not have been listed

48

on the Federal Supply Schedule (FSS) and paid for by certain government programs. These allegations easily state a claim for promissory fraud. *See Allergan*, 2020 WL 7319407, at *40 (relying on *Campie* to find that complaint stated a claim for promissory fraud when defendants "misled the Patent Office to obtain" patents "and then used those patents to maintain their monopoly, which then allowed Defendants to charge much higher prices for the drugs than they otherwise could have").

By failing to address this theory of falsity, defendants have waived any response on appeal.

### 2. The Complaint Pleads Implied False Certification

Implied false certification occurs when a defendant seeks payment from the Government (or causes another to do so), without disclosing noncompliance with a material legal requirement. *See Escobar*, 136 S. Ct. at 1995.

Here, when claims for payment for Apriso were submitted to the Government (either by defendants or by third parties seeking reimbursement from Government insurance programs), they included a price. It was implicit that the price was "fair and reasonable"—or at least not inflated due to a fraudulent scheme. But defendants knew otherwise.

49

Accordingly, the price term of the claims was false, and defendants are liable under the theory of false certification.

This case resembles *Escobar*. There, claims for payment used billing codes corresponding to certain services, and the Supreme Court held that this constituted an implicit misrepresentation because anybody viewing the claims "would probably—but wrongly—conclude that" the people providing services were properly trained and qualified. 136 S. Ct. at 2000. It was irrelevant that the claims themselves said nothing about training or qualifications. It also did not matter that the requirements were not expressly designated as conditions of payment: "A statement that misleadingly omits critical facts is a misrepresentation irrespective of whether the other party has expressly signaled the importance of the qualifying information." *Id*. at 2001.

The same is true here. "Defendants' certification that the prices of the drugs they were listing were 'fair and reasonable' misleadingly suggested that they held valid patents on those drugs that allowed them to charge the government higher prices as a result of the monopolies they held on them." *Allergan*, 2020 WL 7319407, at *37. Those representations were prerequisites to claiming reimbursement for Apriso from

50

Government health care programs. Anybody seeing the price of Apriso would therefore probably—but wrongly—conclude that the price was not based on fraud.

More broadly, courts have concluded that when defendants engage in upstream fraud relating to pricing, that conduct violates the FCA. *See, e.g.*, *United States v. Ehrlich*, 643 F.2d 634, 637 (9th Cir. 1981) (holding that false cost certifications that inflated the price the Government paid violated the FCA); *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 634 (7th Cir. 2016) (upholding claim alleging that the defendant pharmacy had misreported its "usual and customary" prices for drugs by excluding certain discount programs from the calculation, resulting in inflated prices on claims for payment); *United States v. Gen. Dynamics Corp.*, 19 F.3d 770, 771-72 (2d Cir. 1994) (allowing claim to go forward when rules required contractor to provide evidence that negotiated price was "fair and reasonable," and contractor violated the statute "by including" kickbacks paid to subcontractors "in the cost estimates"); *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 100 (D.D.C. 2017) (allowing claim to proceed when contractor "made claims for payment of unreasonable charges while withholding information about

their unreasonableness"). Indeed, one of the FCA's original purposes was to remedy situations in which the Government was "charged exorbitant prices for goods." *Escobar*, 136 S. Ct. at 1996 (quotation marks omitted).

Defendants argue that the claims did not make specific representations about the services provided. Def. Br. 65-66. But the price was an implicit representation about the fairness of the price, just as the use of payment codes was an implicit representation about the quality of the services provided in *Escobar*. *See Allergan*, 2020 WL 7319407, at *36-37 & n.20 (holding that relator met the requirement to make specific representations based on similar complaint).[6]

Defendants argue that the "fair and reasonable" price requirement is too vague to constitute a real certification and support FCA liability. But ambiguity does not defeat a showing of falsity. Instead, a "court's interpretation of [an] ambiguous regulation determines whether [a]

---

[6] If the Court disagrees, we preserve for further review the contention that no specific representations about goods are required when, as here, the fraud relates to the price charged, and not the quality of goods provided. *See United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1018 (9th Cir. 2018) (expressing doubt that "specific representations" requirement applied, but applying it anyway based on interpretation of circuit precedent), *cert. denied*, 139 S. Ct. 1464 (2019).

claim of compliance with [the] regulation was false." *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1052 (8th Cir. 2002) (citing *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 460, 463 (9th Cir. 1999)).[7] Here, Silbersher alleges that the price of Apriso was not "fair and reasonable" because it had been artificially inflated through the unlawful exclusion of generic competitors, by at least a factor of 5. 2-ER-149, 178. Defendants argue that this definition is "not plausible" because it would mean prices are not "fair or reasonable if *any* prior misconduct may have increased the market price." Def. Br. 67. Defendants do not attempt to explain why that is the wrong rule—and it seems quite natural that a defendant cannot knowingly exploit unlawful

---

[7] Defendants' citation refutes their point. They argue that the Second Circuit held that the Medicare Act's medical necessity requirement was too vague to support FCA liability. Def. Br. 66 (citing *Mikes v. Straus*, 274 F.3d 687, 698-99 (2d Cir. 2001)). But the case never held the requirement vague. Instead, it held that "[m]edical necessity ordinarily indicates the level—not the quality—of the service," and faulted the relator for misconstruing the requirement. *Mikes*, 274 F.3d at 698. Indeed, courts universally hold that medical necessity violations can support FCA liability (it is frequently cited in FCA cases). *See, e.g.*, *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1118 (9th Cir. 2020) (holding, and citing other cases holding, that "a false certification of medical necessity can give rise to FCA liability"), *cert. denied*, 2021 WL 666435 (U.S. Feb. 22, 2021).

conduct to inflate the prices taxpayers pay for goods. But if the Court doesn't want to commit to such a broad rule, it need not define the outer limits of "fair and reasonable" here. It would be enough to hold that when the defendant engages in a fraud on the Government, which causes the Government to pay substantially more than the price should be, such prices are not "fair and reasonable" under the regulations.[8] Whatever ambiguity may exist, this case does not fall within it.

## B. The Complaint Pleads Materiality

To trigger liability, a fraud must be "material." The word "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court has explained that materiality focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 136 S. Ct. at 2002 (quotation marks omitted). A matter is material if a reasonable person "would attach

---

[8] In a footnote, defendants posit that "fair and reasonable" means "non-discriminatory and commensurate with the market price." Def. Br. 67 n.16. They have no authority for that definition—and it would make no sense to hold that a contractor may overcharge the Government as long as it overcharges other payors, too. *See Allergan*, 2020 WL 7319407, at *37 (rejecting this argument).

importance to it," or "if the defendant knew or had reason to know" that the recipient would attach importance to it, "even though a reasonable person would not." *Id*. at 2002-03 (quotation marks and brackets omitted).

Materiality does not require causation; instead, materiality is properly understood as potential for causation. The question is whether the defendant lied about something important—not whether that lie actually caused the Government to behave a particular way. *See, e.g.*, *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003) (explaining that materiality "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered"). Of course, causation shows materiality *a fortiori*.

For the promissory fraud claim, materiality looks to whether the defendants' false statements caused the Government to issue the benefit—in this case, the '688 Patent. Because defendants ignore promissory fraud altogether, they do not dispute that the complaint pleads materiality for this claim. Nor could they. The complaint alleges that the information defendants concealed was material to patentability.

2-ER-164–68. Indeed, it quotes from the patent examiner's notes explaining that the USPTO relied on defendants' misrepresentations to issue the patent. 2-ER-169.

For false certification, materiality looks to the likely effect of the defendants' certification on the Government's payment decisions. Here, the false certification was that Apriso's price was fair and reasonable. This certification enabled defendants to sell their products to certain Government programs (the ones that use the FSS), and also anchored the price the Government paid for the drug. 2-ER-177–80.

When a fraud causes the Government to pay more than it should, materiality is met. *See, e.g.*, *Allergan*, 2020 WL 7319407, at *41 (holding that "price goes to the 'essence of the bargain' between the government and drug manufacturers," and that pricing fraud is therefore material); *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020); *Garbe*, 824 F.3d at 639; *United States ex rel. Campbell v. KIC Dev., LLC*, 2019 WL 6884485, at *12 (W.D. Tex. Dec. 10, 2019); *United States ex rel. Strauser v. Stephen L. LaFrance Holdings, Inc.*, 2019 WL 1086363, at *14 (N.D. Okla. Mar. 7, 2019); *United States ex rel. Stepe v. RS Compounding LLC*, 325 F.R.D. 699, 708 (M.D. Fla. 2017); *United States ex rel. Bierman*

*v. Orthofix Int'l, N.V.*, 177 F. Supp. 3d 712, 715 (D. Mass. 2016); *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 52 (D.D.C. 2015); *United States ex rel. Ubl v. IIF Data Sols.*, 2007 WL 2220586, at \*4 (E.D. Va. Aug. 1, 2007).

Defendants argue that an effect on price cannot create materiality *per se*—but the cases cited above say otherwise, and none of defendants' cases are about pricing. Def. Br. 68. Any effect on price meets the plain text of the statute and the Supreme Court's discussion in *Escobar*. Even if price impact were not entirely conclusive, it is a strong factor in Silbersher's favor—and therefore enough, at the pleading stage, to take this case forward.

Defendants argue that the complaint must plead that the Government would have refused to pay altogether. Def. Br. 68. That all-or-nothing view is wrong for two reasons. First, causation and materiality are different, so Silbersher need not show that the Government necessarily *would* have done anything. Second, as the pricing fraud cases above show, it is enough to show that the Government paid more than it should have; it is not necessary to show that the Government would have refused payment altogether. *Cf. Rose*, 909 F.3d at 1022 (finding

57

materiality when the Government had not terminated contracts, but had instead taken more limited steps). In any event, the complaint alleges that the Government would have refused to pay altogether for at least most of the drugs. First, if defendants had not blocked generic competitors, the Government would have purchased generics, and so it would not have paid defendants at all. 2-ER-180. Second, the complaint explains that defendants were only allowed to seek payment from certain programs because they certified that the price was "fair and reasonable." 2-ER-177–78.

Defendants argue that the Government's continued payments for Apriso after the '688 Patent was deemed invalid disprove materiality. Def. Br. 69. This is based on *Escobar*'s statement that when the Government pays claims in full despite "actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." 136 S. Ct. at 2003. But the complaint disputes that the Government had any actual knowledge of violations. 2-ER-177, 180. That renders continued payments irrelevant. *See Campie*, 862 F.3d at 906-07; *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 834 (6th Cir. 2018). In any event,

because materiality is holistic, continued payments are not dispositive when the relator identifies factors supporting a finding of materiality. *See United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1352 (11th Cir. 2021); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016). Here, the countervailing allegation of price impact precludes dismissal.

Defendants cite *United States ex rel. Mei Ling v. City of Los Angeles*, 389 F. Supp. 3d 744 (C.D. Cal. 2019), and argue that it "dismiss[ed] FCA claim." Def. Br. 69. Actually, the court held that "the City's motion to dismiss the FCA claims is DENIED." *Mei Ling*, 389 F. Supp. 3d at 768. On materiality, the court held that the Government had countered the "continued payments" argument by "presenting an alternative explanation" that the Government was reluctant to cut off funds because of "harmful collateral consequences." *Id.* at 763. So too here. Cutting off payments for Apriso would risk harming patients using the drug, and so the fact that the Government has not done so does not refute materiality even if it had actual knowledge of violations (which it did not).

59

### C. The Complaint Satisfies Federal Rule of Civil Procedure 9(b)

Defendants include a one-page throwaway argument that the complaint fails to satisfy Federal Rule of Civil Procedure 9(b), which requires "circumstances constituting fraud" to be stated "with particularity." Def. Br. 70. Broadly speaking, Rule 9(b) requires plaintiffs to allege the "who, what, when, where, and how" of a fraud. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (quotation marks omitted). The allegations must include enough detail "to give adequate notice to an adverse party and enable that party to prepare a responsive pleading." *Ibid*. (quotation marks omitted). But the standard "does not require absolute particularity or a recital of the evidence," and so "a complaint need not allege a precise time frame, describe in detail a single specific transaction or identify the precise method used to carry out the fraud." *Ibid*. (quotation marks omitted).

Instead, courts apply Rule 9(b) in a purposive manner, and refuse to dismiss cases when the defendant has notice of the allegations against it and can prepare a responsive pleading. *See United Healthcare*, 848 F.3d at 1183 n.11. They also do not interpret Rule 9(b) in a way that would undermine the FCA by requiring dismissal based on the absence

60

of details that the plaintiff does not have access to, if the defendant has adequate notice of the charge against it. *See, e.g.*, *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 86 (2d Cir. 2017); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).

Defendants argue that the complaint fails to identify claims for payment. Def. Br. 70. But complaints "need not identify representative examples of false claims." *United Healthcare*, 848 F.3d at 1180 (quotation marks omitted). Such details are especially not required when, as here, the alleged fraud is not about the content of the invoices themselves, and when, as here, the invoices are in defendants' possession. *See United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 124-25 (D.C. Cir. 2015); *In re Baycol Prods. Litig.*, 732 F.3d 869, 876 (8th Cir. 2013). As the Fifth Circuit has explained, "[s]tating 'with particularity the circumstances constituting fraud' does not necessarily and always mean stating the contents of a bill. The particular circumstances constituting the fraudulent presentment are often harbored in the scheme," and not the bills. *Grubbs*, 565 F.3d at 190; *see also United States ex rel. Mastej v.*

*Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 709 (11th Cir. 2014) ("A plaintiff must satisfy Rule 9(b) with respect to the circumstances of the fraud he alleges—but not as to matters that have no relevance to the fraudulent acts.").

Defendants also make the conclusory argument that the complaint fails to plead specifics of the fraudulent scheme. Def. Br. 70. But the complaint lays out, in painstaking detail, the false statements to the USPTO, the way those statements led to the grant of the '688 Patent, the way the patent was used to block generic competition, and the resulting effect on the price the Government paid for Apriso. Defendants do not identify a single material fact that is not well-pled.

## IV. Dr. Falk Is Not Entitled to Dismissal

### A. The District Court Had Personal Jurisdiction Over Dr. Falk

The district court correctly found that it had specific personal jurisdiction over Dr. Falk. The statutory basis is 31 U.S.C. § 3732(a), which provides for jurisdiction anywhere any defendant does business upon service of process. As Dr. Falk concedes, the relevant constitutional

"inquiry is whether the defendant has minimum contacts with the United States as a whole." Falk Br. 19.[9]

This test is met when the defendant has purposefully availed itself of the privilege of conducting business in the United States, for example, by "exploiting a market" here or "entering a contractual relationship centered" here. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, --- S. Ct. ----, 2021 WL 1132515, at *4 (Mar. 25, 2021) (quotation marks and brackets omitted). The plaintiff's claim must also "arise out of or relate to the defendant's contacts." *Ibid.* (quotation marks omitted). Dr. Falk argues that the Court should apply a "causal test" (Falk Br. 27), but it made that argument without the benefit of the Supreme Court's decision in *Ford*, which held that the minimum contacts test "contemplates that some relationships will support jurisdiction without a causal showing" between the forum contacts and the plaintiff's claim. 2021 WL 1132515, at *5. Thus, the Court explained that when a defendant deliberately conducts substantial business in a forum, it "'enjoys the benefits and

---

[9] Dr. Falk asserts that it was not served. Falk Br. 4 n.2. Any related argument has been waived. *See* Dist. Ct. Doc. 86, at 2 ("Dr. Falk confirms that it does not intend to challenge this court's jurisdiction on the basis of improper service of process.").

protection of [the forum's] laws'—the enforcement of contracts, the defense of property, the resulting formation of effective markets," which "creates reciprocal obligations" and makes it fair to hale the defendant into the forum's courts. *Id*. at *8 (citation omitted). In that circumstance, "the 'relationship among the defendant, the forum[], and the litigation'— is close enough to support specific jurisdiction" even absent a causal relationship. *Id*. at *9 (citation omitted).

There can be little dispute that Dr. Falk has purposefully availed itself of the United States. It owns a U.S. patent, obtained from the USPTO, that provides it with property rights *only* in the United States; it licensed that patent to a U.S. company (Salix) so that U.S. companies could maintain a monopoly over Apriso in the United States; it asserted that patent in U.S. courts against other U.S. companies to stop them from selling generic drugs to U.S. customers; and it makes money from all that U.S.-facing activity. None of that was accidental or fortuitous—it was the entire point of obtaining the patent. And Dr. Falk could easily have structured its conduct to avoid any connection to the United States. On any reading of the facts, Dr. Falk reached into the United States to do

business—and specifically to establish and profit from a patent monopoly protecting Apriso.

Dr. Falk attempts to recharacterize its contacts. First, it argues that it did not engage in inequitable conduct. Falk Br. 22-26. As explained above, inequitable conduct has nothing to do with this case—which arises under the statutory FCA cause of action. *See supra* pp.8-9. In any event, whether Dr. Falk engaged in inequitable conduct is irrelevant to whether it purposefully availed itself of the United States as a forum, which it did in many ways. The first among these was obtaining an interest in a U.S. Patent from the USPTO.

Dr. Falk argues that merely being a party in cases asserting infringement of the '688 Patent is not a significant contact. That is nonsense. Dr. Falk was the named plaintiff in U.S. federal actions suing U.S. generic drug manufacturers for alleged violations of U.S. law, in lawsuits designed to stop the U.S. manufacturers from selling their products in the United States. The Federal Circuit has recognized that when a foreign patent owner initiates "judicial or extra-judicial patent enforcement within the forum," it opens itself up to personal jurisdiction. *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1334 (Fed. Cir.

2008); *see also, e.g.*, *Ebates Performance Mktg., Inc. v. MyMail, Ltd.*, 2021 WL 121130, at *10 (N.D. Cal. Jan. 13, 2021) (suing to enforce patents creates personal jurisdiction). This Court, sitting *en banc*, has held that initiating foreign litigation with effects in the United States is enough to create personal jurisdiction here for an action against the foreign plaintiff that arises out of the same events. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1211 (9th Cir. 2006). Obviously, initiating litigation in the United States presents an even stronger case for jurisdiction.

Dr. Falk does not mention its other contacts, *i.e.*, the licensing agreement with Salix, and its profits from U.S. sales of Apriso. But these, too, show that it has purposefully availed itself of the laws of the United States.

Dr. Falk also argues that this lawsuit does not arise out of or relate to its contacts with the United States. Of course it does. The FCA imposes liability not only on those who present false claims or make false statements, but also on those who "cause" others to do so, as well as on those who conspire to violate the FCA. 31 U.S.C. § 3729(a)(1)(A), (B), (C). As the owner of the '688 Patent, Dr. Falk played a role in obtaining it, in

licensing it to Salix, and in asserting it against generic competitors, blocking their entry into the market. Through this conduct, it caused the false claims and false statements that give rise to Silbersher's FCA claim. Dr. Falk deliberately built up and enforced a patent monopoly in the United States, and therefore had clear notice that lawsuits relating to the harm that monopoly caused to people in the United States could be brought against it. *See Ford*, 2021 WL 1132515, at *6-7.

*Ford* makes it clear that but-for causation is not required. But even if it were, this complaint would meet the standard. Had Dr. Falk not obtained the '688 Patent, or licensed it to Salix, there would have been no extended patent monopoly. Had Dr. Falk not asserted the patent against generic competitors, they would have entered the market earlier, bringing the price of Apriso down. Dr. Falk's conduct was, as the district court put it, "a critical part of the alleged scheme." 1-ER-22.

Finally, it does not offend traditional notions of fair play and substantial justice to subject Dr. Falk to jurisdiction for this conduct. Dr. Falk bears the burden on this point, and it has not come close to carrying it. Dr. Falk reached into the United States to make money by defrauding our Government and our taxpayers. It enlisted our court system in its

67

effort. It should expect to answer in those same courts for its unlawful conduct.

## B. Dr. Falk Is Not Entitled to Dismissal on the Merits

Dr. Falk's public disclosure arguments are addressed above. With respect to its other merits arguments, Dr. Falk argues that the claim against it fails, but again it downplays its alleged role.

Dr. Falk's principal argument is that it did not engage in inequitable conduct. Falk Br. 45-48. As already explained, that is not the standard for liability under the FCA. It is enough if a defendant knowingly made false statements, or caused them to be made, that were material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B). No specific intent to defraud is required, and the materiality standard does not require causation. *Id.* § 3729(b)(1), (4).

Dr. Falk argues that the regulatory duty of candor applies only to individuals, not organizations. But when individuals act as agents for corporations before the USPTO, the "individual's actions may be imputed to a corporate patent owner." *Beco Dairy Automation, Inc. v. Glob. Tech Sys., Inc.*, 104 F. Supp. 3d 1023, 1036 (E.D. Cal. 2015) (citing *Avid Identification Sys., Inc. v. Crystal Import Corp.*, 603 F.3d 967, 973 (Fed.

Cir. 2010)). More generally, principals are liable for frauds committed by their agents. *See, e.g.*, *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 n.9 (10th Cir. 2018). Here, Dr. Falk was the listed assignee of the patent, *i.e.*, the party that stood to receive all the rights under the patent if it was granted. It is at least a plausible allegation that the individuals working to obtain the patent were acting as Dr. Falk's agents.

Dr. Falk also makes a Rule 9(b) argument, but its misdeeds are identified with particularity. Dr. Falk was aware of the withheld studies because it participated in them. 2-ER-146–47. Dr. Falk was the assignee of the '688 Patent, and therefore is responsible for misstatements made during prosecution (which were set forth with particularity). 2-ER-154, 163–69. It licensed the patent to Salix, thus extending the patent monopoly for Apriso. 2-ER-154. And it asserted the patent against generic competitors, preventing their entry into the market (those generic manufacturers are identified with particularity). 2-ER-175–76. Through these acts, Dr. Falk caused the presentment of false claims, caused the use of false statements, and conspired with its codefendants

to violate the FCA. It is accordingly jointly and severally liable with the other defendants.

## CONCLUSION

For the foregoing reasons, the dismissal of the complaint should be reversed.

Respectfully submitted,

*s/ Tejinder Singh*

GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
202.362.0636
866.574.2033 (fax)
tsingh@goldsteinrussell.com

Nicomedes Sy Herrera
Bret D. Hembd
HERRERA KENNEDY LLP
1300 Clay Street, Suite 600
Oakland, CA 94612
510.422.4700
855.969.2050 (fax)
NHerrera@HerreraKennedy.com
BHembd@HerreraKennedy.com

Warren T. Burns
Christopher J. Cormier
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
469.904.4550
WBurns@BurnsCharest.com
CCormier@BurnsCharest.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 20-16176, 20-16256

I am the attorney or self-represented party.

**This brief contains** | 14,000 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

◉ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

　　○ it is a joint brief submitted by separately represented parties;

　　○ a party or parties are filing a single brief in response to multiple briefs; or

　　○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [                ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Tejinder Singh | **Date** | Mar 31, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing Appellant's Third Brief to be filed using the Court's CM/ECF system on March 31, 2021. All counsel to parties to the case are ECF users.

s/Tejinder Singh

March 31, 2021